SANBORNTON v. TILTON.     { Aug. 12, 1875.

*Municipal war expenditures—Reimbursement—Division of towns.*

The act dividing the town of Sanbornton, and constituting the town of Tilton, in 1869, provided that all property, and " all debts, claims, and demands of every kind, now owned by and due to the town of Sanbornton," should be divided between the two new towns in a certain proportion; and further provided, that the county commissioners, in case of disagreement between the towns, should make such division between them. Under the reimbursement acts (so called), passed in 1870 and 1871, the state commissioners awarded to Sanbornton and Tilton $22,483.33, which the county commissioners, upon proper application, divided between the two new towns in the proportion required by the act of division. *Held,* that although no legal or equitable claim or right to be reimbursed for war expenditures existed in favor of Sanbornton at the time of the passage of the act incorporating Tilton, and until the passage of the reimbursement acts, yet the expenditures had been incurred, and existed as the basis of the bonds subsequently authorized, and by the reimbursement acts made a claim which brought the bonds growing out of the claim within the provisions of the act incorporating Tilton, and made them subject to division by the county commissioners.

The doctrine of *Sanbornton* v. *Tilton,* 53 N. H. 438, reaffirmed.

TROVER, for certain bonds issued by the state, bearing date January 1, 1872, alleged to have been converted September 3, 1873. This action was, at the September term, 1874, committed to a referee, who, at the March term, 1875, reported the following facts:

The bonds were issued under the authority of the act entitled "An act to authorize a limited reimbursement of the municipal war expenditures," approved July 2, 1870, and of the act in addition thereto, approved July 15, 1871, and were delivered by the state treasurer and received by the defendant town September 3, 1873, as bonds to which said town were entitled under the provisions of said acts and the proceedings hereinafter recited. Commissioners were appointed by the governor and council, in pursuance of the second section of the act of July 2, 1870, to determine the amount of reimbursement to which each city, town, &c., was entitled under said act. The duties of the commission were completed about June 1, 1872. In a report made by the commissioners to the governor and council, about January 25, 1872, they determined the number of men furnished by the town of Sanbornton for the military service of the United States, under and after the call of July 2, 1862, to have been 1 four-years man, 216 three-years men, and 30 nine-months men, and the amount of reimbursement to be assigned on account thereof, on the basis prescribed in the first section of the act of

July 2, 1870, to be $22,483.33. About June 1, 1872, the commissioners filed for record in the adjutant-general's office a tabular statement, signed and certified by them to be a true record, setting forth in separate columns the names of the cities, towns, &c., entitled to the reimbursement, the number of men furnished, and length of service, and the amount in dollars and cents of reimbursement to be made. In the first column in this table is entered "Sanbornton and Tilton;" against this entry is entered in the second column the number of men and times of service as stated in the report to have been furnished by Sanbornton, and against it in the third column the sum $22,483.33. I therefore find that it was determined by the commissioners that the towns of Sanbornton and Tilton, together, were entitled to the reimbursement in bonds to an amount corresponding to the sum of $22,483.33, but without determining in what proportions. The act constituting the town of Tilton from a part of the territory of Sanbornton was approved June 30, 1869, prior to the passage of said reimbursement acts, and subsequent to the expenditures for which reimbursement is authorized by those acts. On April 9, 1872, the town of Tilton, by their selectmen, applied in writing to the county commissioners of Belknap county, setting forth that, by the act of the legislature constituting said town, it was provided that if the town and Sanbornton could not agree upon the division of any property or funds belonging to Sanbornton or in which they might have an interest, present or prospective, the county commissioners, for the time being, upon the request of either town, may make division of the same, according to the proportion fixed by law; and further setting forth that, prior to the passage of the act constituting the town of Tilton and during the war of the rebellion, the town of Sanbornton, of which Tilton then formed a part, expended large sums of money in bounties and in equipment of soldiers enlisting from said town into the military service of the United States; and that, by force of the acts authorizing a limited reimbursement of the municipal war expenditures, there was allowed to Sanbornton, for said war expenses, bonds of the state to the amount of $22,483.33, of which sum, according to the proportion fixed by the law constituting the town of Tilton, the said town of Tilton were justly and legally entitled to the sum of $12,365.83, and should have that proportion of the bonds so allowed to Sanbornton, with the accruing interest from the date of issue; and further setting forth that Sanbornton refused, though thereto requested, to deliver to Tilton their proportion, or any part of said bonds, or to account for the same, or to make any division thereof, and praying that said commissioners would make division of said bonds according to law. On this application a hearing was had before the commissioners, on due notice to the towns, on May 19, 1873, and upon said hearing the commissioners made and published their report, or award, setting forth that the town of Tilton should have $12,365.83, with the accrued interest of said bonds, and the town of Sanbornton $10,117.50, with the accrued interest thereon. On said May 19, the selectmen of Tilton duly appointed an agent to receive the bonds belonging to the town from the

state treasurer; and on May 20, the selectmen of Sanbornton notified the state treasurer not to deliver any of said bonds to the town of Tilton. On August 22, 1873, the governor and council, in executive session, voted that the state treasurer be authorized to deliver to the proper persons, representing the towns of Sanbornton and Tilton respectively, the bonds then in the hands of the treasurer assigned to the town of Sanbornton by the commissioners under the acts authorizing a limited reimbursement of the municipal war expenditures, according to the report of the county commissioners of Belknap county on that subject; and on September 3, 1873, the bonds in suit, corresponding to the said sum of $12,365.83, were delivered by the state treasurer and received by the agent of Tilton for said town, and said bonds have since been sold by Tilton and the proceeds applied to their own use. The town debt of Sanbornton, at the time of the incorporation of Tilton, amounted to about $88,000, which, being divided between the two towns in the proportion established by the act incorporating Tilton, leaves about $48,370 to be paid by Tilton and $39,574 by Sanbornton, while the value of town property, exclusive of school and parsonage funds and the year's taxes owned by Sanbornton and divided between them in the same proportion as provided in the act, gives to Tilton about $5,055 in value, and to Sanbornton about $4,136. The relative proportion of polls and ratable estate in said towns at the time of the incorporation of Tilton, and since, has been about as 311 to Sanbornton and 257 to Tilton, and the proportion may not be expected materially to change in future years while said bonds are maturing.   *   *   The question of law, whether the bonds are property, claims, or demands owned or due to Sanbornton, within the meaning of section 2 of the act incorporating Tilton, to be divided, in case of disagreement between the towns, pursuant to the provisions of that section, is reserved and submitted by the referee to the determination of the court. If the court shall be of opinion that said bonds are property, claims, or demands, within the meaning of that section, and that the county commissioners had authority to make division under said section, then I find and report that the defendant town is not guilty, and award that the town of Tilton recover of the town of Sanbornton the costs of reference, to be taxed at    , and the costs of court to be taxed by the court; but if the court shall be of opinion that the said county commissioners had no authority under and pursuant to said section to make division of said bonds as property, claims, or demands, within the meaning of said section, then I find that said town of Tilton were guilty, and assess damages in the sum of $2,590, including interest to the fourth Tuesday of March, 1875; and I award and determine that the plaintiffs recover said sum of the defendants, with costs of reference taxed at    , and costs of court to be taxed by the court.

The questions arising on the foregoing report were transferred to the superior court for determination by RAND, J.

*Ira A. Eastman* (with whom were *Jewell & Smith* and *Whipple*), for the plaintiffs.

\*    \*    \*    \*    \*    \*    \*    \*

By section 2 of the act of 1869, constituting the town of Tilton, it is clearly apparent that it was only the property, debts, claims, and demands, having an existence at the time of the passage of the act, that were to be divided. There is nothing prospective in the act, or anything that can bear such a construction. There is no allusion to any claim or demand existing in any form against the state, or against any one on account of the war debt of the town, or on account of anything prospective in its nature—nothing that looks towards any such state of things as reimbursement acts, or bonds issued by any such acts; and in order that everything of a prospective nature might be clearly excluded and placed beyond controversy, the very important word "now" is inserted in the section—" all real and personal property *now*   \*   \* owned "—" all debts, claims, and demands of every kind *now* owned and *due* to the town of Sanbornton." No stronger or more emphatic language could have been used to show the intention to confine the division to what had at that time an actual existence. It would have been a very easy matter to have omitted the word " now," and made perfect sense of the section; and to us the conclusion seems irresistible, that it must have been put there with the clear and positive design of showing that it was only such property, debts, claims, and demands as had an actual existence at the time the act was passed, that could be divided, or were intended to be. At the time this act was passed, in 1869, these bonds had not in any way been created, nor was there any statute of any kind that authorized them to be made, or that recognized in any way the existence of any debt, claim, or demand due to the town from the state; nor had the town of Sanbornton any account, claim, or demand of any kind upon their books, or records, or in any form against the state or against any party for their war debt. If they had furnished their own men at the call of the president, instead of hiring substitutes and paying bounties, that debt would never have been created; and although we do not intend to cast any censure upon the town for taking the course which they did, yet it is most manifest that this debt was voluntarily incurred by their own action, without any promise by the state, or inducement held out by the state, that it would ever be assumed. It was created by themselves, and was legally chargeable only to themselves. How, then, can it be said, with any regard to the meaning of language, that here was, in 1869, when the town was divided, either a debt, or a claim, or a demand, which was owned by and due to the town of Sanbornton? We confess our entire inability to fathom it. The war debts of the several towns did not even form a basis for the acts of 1870 and 1871, for in some towns no such debts existed, and probably no two towns had pursued precisely the same course in incurring their debts; and, as if aware of the inevitable construction to be put upon the law, the counsel for Tilton, in their petition to the county commissioners, represent the act of 1869 as providing for a division of all property and debts, present and " prospective"—a slight error in stating the provisions of the statute, but one arising, no doubt, from a

consciousness that no property or funds of the kind existed at the time of the passage of the act. It was not, then, by reason of any debt, or claim, or demand upon the state, which existed at the time that the town was divided, but only by virtue of the acts of 1870 and 1871, that these towns could receive any of the bonds, or the proceeds of the same, named in those acts. The state was under no obligation to pay the debts of the towns, which had been incurred by their own action ; and, until the passage of the first named act in 1870, no claim whatever existed in favor of the towns against the state. It was by that act and that alone that claims in the form of the bonds were created against the state and made to exist ; and those acts were passed, not because of the existence of any legal or equitable claim upon the state by towns and cities, but to aid them with the superior credit of the state, by which money could be raised beyond its limits, and at a less rate of interest than by the towns and cities ; and although the bonds come in form from the state, yet in reality they are from the cities and towns, because the state is made up of the cities and towns, and derives its existence and also its means from them ; and it is by taxation upon them that the annual interest on the bonds is to be paid, and eventually the principal also ; and should these bonds be divided as Tilton contends, this injustice will be the result,—that Sanbornton will have to pay $1,010 of the annual interest, while Tilton will contribute only $728 ; and of the principal of the bonds, Sanbornton will have to pay $12,847.61, while Tilton will pay only $9,635.72.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

All the proceedings in this controversy, up to the time of the present case, have gone upon the erroneous assumption that the award of the state commissioners was made wholly and exclusively to the town of Sanbornton ; and the question now presented to the court arises upon a totally different state of facts from that heretofore discussed. In the previous proceedings the tribunals appealed to seem to have felt that they must strain the law, or Tilton might not be able to hold any of the these bonds, although Sanbornton have always been ready to make what they considered a fair division, and give to Tilton what they will now take by the decision of the referee. This court by a change of the facts is happily relieved from any such pressure, and have only to follow the plain and unequivocal language of the statute in order to do justice and equity between the parties. We submit, then, with much confidence, that these bonds were not, in any just or proper sense of language, property, either real or personal, or debts, claims, or demands owned by or due to the town of Sanbornton at the time of the division of the town in 1869, which the county commissioners could legally divide under that act; that whatever claims the towns have upon the state have been created, since the passage of that act, by virtue of the statutes of 1870 and 1871 ; that a just and equitable division of the bonds has been made by the referee ; and that the plaintiffs should have judgment for the amount found due by him.

*Pike & Blodgett* (with whom were *Rogers* and *Barnard*), for the defendants.

I. The first question raised by this case, and submitted by the referee, is, whether the bonds are property, claims, or demands, owned by or due to Sanbornton, within the meaning of section 2 of the act incorporating Tilton, to be divided, in case of disagreement between the towns, pursuant to the provisions of that section. We hold the law to be affirmative of this proposition, and that the bonds are property, claims, &c. (1) Of course, it will not be urged that the bonds, *eo nomine,* existed at the time the act constituting the town passed. The bonds are simple evidences of indebtedness—a substitution for a prior claim. They must have been issued to the town either as a gratuity, or as a substitute for and in payment of some existing claim or demand which the town equitably and justly held against the state. We think it cannot, with any fairness, be urged that they are a gift to the towns. Every implication is against this. The state was largely in debt; the towns would not have asked such a gratuity; the legislature would not have granted it had it been asked: it had no constitutional power to give away money in such a way. At the time Tilton was constituted a town, by the act of June, 1869, Sanbornton, in common with most if not all the towns in this state, had a just claim against the state growing out of the municipal war expenditures. That the towns had such claims was at the time well understood, and fully admitted on all hands. The acts of June sessions, 1870 and 1871—Session Laws, pp. 412, 513—recognize these expenditures as a just claim on the state, and a legal consideration for the bonds authorized to be issued by the first act. They were passed to provide for partial payment, accordingly. The title of the act of 1870 is, "An act to authorize a limited reimbursement of the municipal war expenditures." Section 1 of the same act expressly provides that the payment thereby authorized " shall be in part payment for any claim upon the state, on account of its war debts, by any such city or town," &c. Section 2 of the act of 1871 provides that " whenever the said quota or claims shall be actually paid by the governor," &c., it shall be in discharge of their quota or claims. Section 1 of the law of 1870 provides that these " bonds, or their proceeds, shall be devoted exclusively toward the reimbursement of the expenditures incurred by the cities and towns * * * for war purposes during the rebellion,"—all of which most clearly indicates that the legislature authorized the issuing of the bonds as payment, in part, of a claim existing in favor of the towns against the state. The referee does not find, in terms, that even Sanbornton had any claim or demand on the state at the time of the passage of the act of 1869 ; but the conclusion is quite clear that he proceeds on the ground that the act of 1870 authorized the payment of the claim of the corporation or corporations now constituting both Sanbornton and Tilton to the extent of one hundred dollars for each three-years man, and for less service in the same proportion. (2) But

the question is not only whether the bonds are property, claims, and demands, &c., but, also, whether they are such, to be divided within the meaning of the said section 2, in case of disagreement between the towns. It seems clear that Sanbornton, at the time of the division of their territory, had a just claim against the state, which afterwards the state recognized, and by their bonds promised to pay in part; that this claim, for which the bonds are simply a substitute, antedates the act of 1869, and now belongs to all the parts now making up the old town. If Sanbornton had a claim at the time Tilton was constituted, which the state was equitably bound to adjust, of course Tilton, by right, became entitled to such a portion of it as is fixed by the law of 1869; for the second section of that act provides that "all real and personal property, including all debts, claims, and demands of every kind now owned by and due to the town of Sanbornton,  *  *  shall be divided between them in the proportion of four dollars and fifty cents to Sanbornton, and five dollars and fifty cents to Tilton," or nine and eleven twentieths to each respectively. The legal construction and effect of the act of 1869 entitles Tilton to the proportion of the bonds awarded by the county commissioners. The word "claims," either in its etymological or legal sense, does not imply a legal or actual right merely : a supposed right, legal, equitable, moral, or otherwise, or a right claimed, is included within the meaning of that word. As has been said, these war expenditures by the towns have always been regarded as just claims against the state and the general government. The general government has very recently recognized the bounties paid by the towns in this state for enlistments as just claims against it, by the late act of congress providing for the payment of these claims to this state. The general government deals with the state as the representative of the towns; and it would be inconsistent to make repayment of these bounties to the state as just claims against the general government, and yet hold that they were not equally claims of the towns by which the bounties were actually paid. These payments of the towns formed a part of the expenditures from which the war debts of the towns arose. In the restricted sense of the word " claim," which seems to be contended for by the plaintiffs' counsel as something which can be enforced by the laws of the land, no claim could ever exist against the state, for no suit in equity or at law lies against it. In this sense the bonds are no better than the claim. Nor is the position claimed by counsel, that " until the passage of the first named act in 1870 no claim whatever existed in favor of the towns against the state," correct, for those acts were not the creation of gratuitous gifts independent of prior considerations, and the operation of them was to be regulated strictly by the extent of those considerations.

II. The second question submitted by the referee and raised by the case is, in case the court shall be of the opinion that said bonds are property, &c., within the meaning of said section 2, whether the county commissioners had authority to make division under said section. We claim that this question was decided by the full court in this case some

two years ago, fully affirming not only the authority but the exclusive jurisdiction of the county commissioners to make the division. The defendant town in this case brought a bill in chancery against the plaintiffs and the state treasurer, asking the court to decree them their share of the bonds and the delivery of the same. The present plaintiffs answered, claiming all the bonds. The case has not been reported.* Upon the dismissal of this bill, Tilton having called out the county commissioners, and after full hearing, had awarded to them the full sum claimed; whereupon Sanbornton applied to the court for an injunction to restrain the state treasurer from paying Tilton the sum in bonds named in the said award. This application was determined by the whole court. *Sanbornton* v. *Tilton*, 53 N. H. 438. The application for an injunction was denied. These two decisions decide every question which has been or can be raised in this case, and in favor of Tilton.

It is urged by the plaintiffs that "the question now presented to the court arises upon a totally different state of facts from that heretofore discussed." Not a single fact appeared before the referee that had not been presented before, save the tabular statement referred to in the case filed in the adjutant-general's office, headed "Sanbornton and Tilton." The report of the state commissioners, which had been used, was the one filed in the office of the state treasurer, headed "Sanbornton" only. This makes no different case, unless it be to confirm the claim which the defendants have always urged, that Tilton had an

---

* TILTON *v.* SANBORNTON.

The opinion is as follows:

JEREMIAH SMITH, J.   If the act creating Tilton out of part of the territory of the old town of Sanbornton had contained no provision respecting the debts, demands, and claims then owned by or due to the old town, *i. e.*, the old corporation, the remaining part of the whole town of Sanbornton would have retained the entire property in all such debts, &c., and Tilton would have had no interest therein. PARSONS, C. J., in *Windham* v. *Portland*, 4 Mass. 384, p. 389; PARKER, C. J., in *Hampshire* v. *Franklin*, 16 Mass. 76, p. 86; FOWLER, J., in *Troy* v. *Haskell*, 33 N. H. 533, pp. 539, 540; Dill. on Mun. Corp. sec. 138. If, then, Tilton has any right to the property now in controversy, it is derived solely from the provisions of the statute creating the new town: their only right to call for a division of this property is created by that statute. The same section of the statute gives a remedy whereby they may obtain a division,—constituting the county commissioners a tribunal to make partition. It is a familiar law, that when a statute creates a new right and presents a remedy or means of enforcing the right, a party claiming the right under the statute is confined to the statute remedy. *Dudley* v. *Mayhew*, 3 Coms. (N. Y.) 9; Bish. on Stat. Cr., sec. 249; *Elder* v. *Bemis*, 2 Met. 599, p. 604; RICHARDSON, C. J., in *Green* v. *Bailey*, 3 N. H. 33, p. 34. But for the statute provisions of sec. 2 of ch. 58, Laws of 1869, no tribunal could have had jurisdiction of this question of division, for there would have been no common property to be divided.

That section gave Tilton an interest in certain property, and a right to insist upon a division of the same. But the same section also designated a tribunal to make the division, and the fair inference is, that this mode of obtaining a division was intended to be exclusive. Tilton must take the right as conferred by statute, or not at all. The bill must be dismissed on the ground that this court has no jurisdiction of an application for partition.

REPORTER.

interest in the bonds.  The proportion of interest is left to the law of 1869.  It has nowhere else been defined.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

*Eastman,* in reply.

I. Counsel say that " these bonds are simple evidences of indebtedness,—a substitution for a prior claim."  What indebtedness ? we ask. When and by what law was it created, or in what form did it exist ? It must have been by some " higher law," for it is plain there was no principle of common law upon which it could be founded ; and it is equally clear that there was no statute of the state recognizing anything of the kind ; and there is nothing in equity upon which such a claim could be based, for the debts of the towns had been incurred upon their own motion and without any request from the state.  The whole idea of a debt or claim against the state until the issuing of the bonds, is a mere myth, and incapable of any legal description whatever ; and hence it is that counsel do not attempt to point to any law showing the existence of any debt, claim, or demand at the time the town was divided, or to any form in which it existed, but are forced to rely upon the simple *ipse dixit* that such claims did exist.  It would seem very plain, that, at the time the town was divided, there was no idea of the existence of any such debt due from the state ; for if there had been, it would undoubtedly have been mentioned in the second section of the act, by which the property, debts, claims, and demands were to be divided.  The school and literary funds are mentioned,—matters of much less consequence in amount ; and so important a matter as this war debt of the town would not have been passed over, if any one had then supposed that it had any legal or equitable existence.  And we desire to call the attention of the court once more to the particular phraseology of this second section : " the debts, claims, and demands now owned and due."  The " claims and demands " were not only to be owned at the time the act was passed, but they must be due also ; that is, they must be in the nature of debts,—the words " claims and demands," as here used, being evidently equivalent to " dues."

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

II. As to the proceedings heretofore had before the court, we desire to say very briefly, first, that no decision has been made upon a case like the one now under consideration.  The previous proceedings have all been founded upon the assumption that the whole $22,483.33 had been assigned to Sanbornton.  This fact evidently had an important influence upon the mind of SARGENT, C. J., in the matter before him ;— and JEREMIAH SMITH, J., states the matter hypothetically with an " if,"—" if Tilton has any right to the property now in controversy." We submit that the question as now presented has never been fully considered and decided by the court.  But, second, we contend, that even had the court gone to the extent claimed by the defendants' counsel, it would not and should not be conclusive in the present case,

where all the facts are before it as stated by the referee, but that the court should decide by its own view of what the law really is.

SMITH, J.   The plaintiffs contend that, at the time the old town of Sanbornton was divided—June, 1869—there was no claim or demand in favor of the town or debt due to the town of Sanbornton, on account of the bonds involved in this suit, or on account of the expenditures for which the bonds were subsequently issued, and that neither the bonds nor any right or claim of Sanbornton to them was property, debt, claim, or demand owned by or due to Sanbornton, to be divided pursuant to section 2 of the act incorporating Tilton; that, although the reimbursement acts refer to the war expenditures of the towns, cities, &c., as an indebtedness of or claim against the state, they became such only by reason and because of the enactment, and the enactment was itself merely a change in the policy of the law in giving the credit of the state to the towns, and thus throwing the burden of the municipal war expenditures as a common burden upon the people of the whole state, instead of leaving the burden distributed among the same people in their municipal character, as cities, towns, &c.; and that upon these views the county commissioners had no authority, under the act incorporating Tilton, to make division of the bonds between the two towns.

The defendants contend, that although the bonds, *eo nomine*, were not in existence at the passage of the act incorporating Tilton, and no legal or equitable right or claim to be reimbursed for war expenditures existed in favor of Sanbornton against the state until the passage of the reimbursement acts, yet the expenditures had been incurred, and existed as the basis of the bonds subsequently authorized, and by the reimbursement acts made a claim which brought the bonds growing out of the claim within the provisions of the act incorporating Tilton, and made them subject to division by the county commissioners.

These parties have been before the court twice previously, in which the question of the division of these bonds was considered, and I see no reason to change the result which has been heretofore reached. At the September term, 1872, of the supreme court for this county, a bill in equity was entered by the town of Tilton against the town of Sanbornton and the state treasurer, asking for a division of these bonds. At the December term, 1872, the bill was dismissed, upon the ground that the county commissioners were the only tribunal designated by the legislature to make partition of the property of the old town between the two new towns, and, consequently, that the court had no jurisdiction of an application for partition.

After the partition made by the commissioners, the town of Sanbornton filed a bill at the June term, 1873, of the supreme court for this county, against the town of Tilton and the state treasurer, reported in 53 N. H. 438, praying that the treasurer might be restrained by injunction from paying over to the town of Tilton any part of said bonds, and that the town might be restrained from receiving them. The hearing upon the application for a temporary injunction was adjourned into the

full court, and at the same term it was refused.   The court then held, —the decision being delivered by SARGENT, C. J.,—that the amount awarded to the several towns under the reimbursement acts was designed to be in the nature of, and to be treated as, a debt due from the state to the towns for a portion of the amount expended by the towns in furnishing men for the service of the United States in the late war; also, that, as the act dividing the town of Sanbornton provided that all property, and all debts, claims, and demands of every kind, owned by and due to the town, should be divided between the two new towns in a certain proportion, the amount assigned to the old town under the reimbursement acts should be divided between the two new towns in the same proportion.

We are asked by the plaintiffs to reconsider these questions, upon the ground that the questions as now presented have never been fully considered and decided by the court.  It would be a somewhat remarkable occurrence, if these questions should twice come before the court, and fail on both occasions to be fully considered.   It could not be, certainly, from lack of vigilance on the part of able counsel to present the questions intelligently to the court, while the case, as reported in 53 N. H. 438, 442, shows that the complaint now made—that the court did not fully consider or decide these questions—is unfounded.

We have, however, considered this case, as it is now presented to the court, as fully as we have been able to, but without coming to a different conclusion.   By the second section of the act constituting the town of Tilton, approved June 30, 1869, it is provided that " all real and personal property, including all debts, claims, and demands of every kind now owned by and due to the town of Sanbornton, all school and other funds belonging to said town, and the proportion of the literary fund, which, until a new apportionment of state taxes, shall be payable to said towns, shall be divided between them in the proportion of four dollars and fifty cents to Sanbornton and five dollars and fifty cents to Tilton.   And if said towns cannot agree upon the division of any such property, the county commissioners of the county of Belknap, for the time being, upon the request of either town, may make division of the same, or assign the same, or any part thereof, to either of said towns, and may order the town to which such property may be assigned to pay over such sums of money to the other town as in their opinion is equitable, according to the foregoing proportion, and may fix the time of payment."

The plaintiffs lay great stress in the argument on the words "*now* owned by *and due,*" claiming that the legislature only provided for a division of claims and demands due to the town of Sanbornton at the time of the passage of the act.   It is hardly to be presumed that the legislature intended to provide for a portion of the demands and claims belonging to the town, and leave the remainder unprovided for and subject to contention.

The act took effect upon its passage, so that any claims or demands that accrued subsequent to the passage of the act, would accrue in favor

of the new town of Sanbornton as it has been constituted since the severance of Tilton from its territory. The two new towns being two distinct municipalities from and after June 30, 1869, neither could have any interest in any claims or property accruing to the other after the separation. But as to all claims existing at the time of the separation, it is hardly possible that the legislature would intentionally make provision for a portion only of the same.

But the plaintiffs contend that there are claims that accrued to the plaintiffs since June 30, 1869. Let us see if this position is correct. Nominally, it may be so; but how is it, really and substantially? The act of 1870 (1 Sess. Laws 412) is entitled "An act to authorize a limited reimbursement of the municipal war expenditures." Section 1 authorizes the issue of bonds, to "be devoted exclusively toward the reimbursement of the expenditures incurred by the cities, towns, locations, or grants of the state for war purposes during the rebellion upon the following basis: each city, town, location, or grant shall receive from the state one hundred dollars for every man furnished for the military service of the United States, under and after the call of July 2, 1862, and accepted by the United States for the term of three years, and in the same proportion for every man so furnished and accepted for whatever period, and the same *shall be in part payment* for *any claim upon the state* on account of its war debts, by any such city, town, location, or grant."

The title to this act recognized the issue of the bonds as a limited *reimbursement* of these war expenditures by the towns; and the act provides that it shall be in part *payment* for any *claim* upon the state on account of such war debts. The issue of these bonds by the state is placed distinctly upon the ground, not that they are a gratuity to the towns, but a *payment* of the *claims* of the towns upon the state for such extraordinary expenditures. They were expenditures, not for the ordinary and usual purposes for which towns are organized, but for an extraordinary purpose more legitimately belonging to the state, and shifted by the state, for various reasons, upon the towns, in the perilous emergency in which the state and nation were placed, and which the state subsequently assumed in the manner provided by the acts of 1870 and 1871.

Section 2 of the act of 1871 provides that whenever the quota of each city, town, &c., as ascertained by the commissioners, shall be ready for payment, "and the said quota or claim shall be actually paid by the treasurer, under the direction of the governor with the advice of the council, to such cities, towns," &c., "as may be entitled to receive the same," &c.

When the suit in equity was before the court in June, 1873, it was assumed that the award of the commissioners was to the old town of Sanbornton, for the full amount of $22,483.33; and the tabular statement which had been used in the office of the state treasurer contained the name of Sanbornton only. It appears now, however, from the report of the referee, for the first time in the course of the litigation which has been carried on between these towns, "that, about June 1,

1872, the commissioners filed for record in the adjutant-general's office a tabular statement, signed and certified by them to be a true record, setting forth in separate columns the names of the cities and towns, &c., entitled to the reimbursement, the number of men furnished, and length of service, and the amount in dollars and cents of reimbursement. In the first column in this table is entered " Sanbornton and Tilton." Against this entry is entered, in the second column, the number of men and times of service, as stated in the report, to have been furnished by Sanbornton; and against it, in the third column, the sum " $22,483.33."

The second section of the act of 1870 (1 Sess. Laws 413) provided that " a commission appointed by the governor and council shall determine the amount to which each city, town, location, or grant is entitled." Here, it will be observed, the legislature provided for a tribunal to ascertain and determine the amount to be reimbursed to the several towns, with no provision for any appeal, or resort to any other tribunal. Their action was to be final and conclusive. And it will be noticed that, by the act of 1871, sec. 2 (1 Sess. Laws 513), whenever the quota of each town, " as ascertained by the commissioners," shall be ready for payment, " and the said quota or claim shall be actually paid by the treasurer, under the direction of the governor with the advice of council, to such cities, towns, &c., as may be entitled to receive the same, then," &c.,—the legislature again providing for ascertaining the claim of each town by the commissioners, and for its payment by the treasurer, under the direction of the governor and council.

The commissioners, under the authority of these acts, awarded to the towns of Sanbornton *and Tilton*, and not to Sanbornton alone, as was erroneously supposed in the former suit between these parties—reported 53 N. H. 438—the sum of " $22,483.33," without designating the sum to which each town was entitled.

It further appears, from the report of the referee, that, upon the application of the town of Tilton to the county commissioners of this county, on April 9, 1873, they, on the 19th of May, 1873, awarded that said bonds should be divided between the two towns in the same proportion provided in the act of 1869, for dividing the claims, demands, and other property of the old town between the two new towns, viz., $12,365.83, or eleven twentieths, to Tilton, and $10,117.50, or nine twentieths, to Sanbornton, which sums the governor and council authorized the state treasurer to deliver to the respective towns, August 22, 1873.

I cannot see why the action of these different tribunals does not dispose of the whole matter. It is quite apparent that the legislature regarded the issuing of these bonds as a payment to the towns of their claims upon the state for extraordinary expenditures during the war, which did not legitimately belong to the towns, but which it was eminently just and proper the state should assume. Whether the award be considered an award to the two new towns, or to the old town, it seems clear beyond question that the legislature intended it should be

regarded in the nature of a repayment of the war debts of the towns. It would be signally unjust that the award should be made to that portion of the old town comprised within the limits of the present town of Sanbornton, when the territory comprised within the limits of Tilton bore its proportionate share of the burden. As was remarked by SARGENT, C. J., in 53 N. H. 441,—" It seemed just and equitable, if this debt was to be repaid in any part, that it should be repaid to the towns in the same proportion in which they had assumed the debt which was thus repaid."

The bonds, *eo nomine*, did not exist at the time the act of 1869 was passed ; but they are the evidence of the claim, which the state has since recognized, that the town then had against it, and are in fact a substitution for that claim. It cannot be contended that they were a gratuity to the town : the whole drift and tenor of the language of the acts of 1870 and 1871 are in the opposite direction, as I have attempted to show : they were intended by the legislature in part payment of the extraordinary and unusual burdens which the state compelled the towns to bear in a time of imminent peril to the nation,—burdens which in no sense belonged to the towns as towns to bear, but which properly and naturally belonged to the state and national governments, —and which the national and different state governments have, since the close of the war, recognized in various ways. If the necessities of this case required it, we might hold, as the defendant has argued, that " the word ' claims,' either in its etymological or legal sense, does not imply a legal or actual right merely : a supposed right, legal, equitable, moral, or otherwise, or a right claimed, is included within the meaning of that word." In the restricted sense contended for by the plaintiffs, a " claim " would be something which could be enforced by legal process. If that be so, neither the bonds, nor the original claim of the town by reason of these extraordinary expenditures, are a claim against the state, because no suit at law or in equity lies against it.

From whatever point of view this question is examined, I can come to no other conclusion than the one that these bonds should be treated as payment of the claim which the town of Sanbornton had against the state, at the time of the passage of the act, June 30, 1869, constituting the town of Tilton, by reason of their extraordinary expenditures in time of war in behalf of the state ; and if this result is correct, there should be judgment on the report of the referee for the defendants for costs.

CUSHING, C. J.   The question raised by the referee is, whether the bonds are property, claims, or demands owned or due to Sanbornton, within the meaning of section 2 of the act incorporating Tilton, to be divided in case of disagreement between the towns pursuant to the provisions of that section.

It appears to me that this question was decided in the case of *Sanbornton* v. *Tilton*, 53 N. H. 438. In that case it was found as fact that the award of the commissioners was made to Sanbornton alone. In this, it is found that the award was made to Sanbornton and Tilton jointly. But in each case the bonds, according to that decision, repre-

sent what the court decided to be a claim belonging to the old town of Sanbornton at the time of the division, and to be apportioned according to the statute by which that division was effected.

If the question were to be considered *de novo*, I should, for the reasons assigned by my brother SMITH, be of the same opinion.

LADD, J., concurred.

*Judgment for the defendants.*